UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
WILLIAM R. WEINSTEIN, individually and on          :
behalf of the People of the United States of America,     :          No. 17-cv-1018
                                                                                  :
                                           Plaintiff Pro Se,          :
                                                                                  :
                -vs.-                                                        :          **CLASS ACTION**
                                                                                  :          **COMPLAINT**
DONALD J. TRUMP, in his official capacity as           :
President of the United States of America, and           :
DONALD J. TRUMP, JR, ERIC TRUMP and            :
ALLEN WEISSELBERG, as Trustees of a                  :
publicly described but not publicly named Trust,       :
                                                                                  :
                                            Defendants.          :
-------------------------------------------------------------------X

   Plaintiff William R. Weinstein ("Plaintiff"), individually and on behalf of the People of

the United States of America ("the People"), alleges upon personal information as to himself,

and upon information and belief as to all other allegations, for his Class Action Complaint

("Complaint") against Defendants Donald J. Trump, in his official capacity as President of the

United States of America, and Donald J. Trump, Jr., Eric Trump and Allen Weisselberg, as

Trustees (collectively "the Trustees") of a publicly described but not publicly named Trust (the

"Trust"), as follows:

**THE PARTIES**

   1.  Plaintiff is a citizen of the United States, and resides within this District.

   2.  President Trump, who was inaugurated on January 20, 2017, is the 45th President

of the United States. He is being sued in his official capacity as President.

   3.  Donald J. Trump, Jr., Eric Trump and Allen Weisselberg are the Trustees of the

Trust. The Trustees' business address is 725 Fifth Avenue, New York, New York 10022 (Trump

Tower).

1

## JURISDICTION AND VENUE

4.     The Article III judicial Power is jurisdictionally vested in this Court under 28 U.S.C. §1331, because the action arises under the Constitution.

5.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because President Trump, a defendant, is "an officer . . . of the United States . . . acting in his official capacity," and (A) one or more of the Trustee defendants reside in this judicial district, (B) a substantial part of the events giving rise to Plaintiff's claims have occurred and will occur in this judicial district, and a substantial part of personal property that is the subject of the action is situated within this judicial district, and (C) Plaintiff resides in this judicial district and the action does not center directly on real property, as with actions concerning the right, title or interest in real property.

## STATEMENT OF FACTS

6.     In light of his vast business holdings, including in a number of foreign countries as well as the United States, President Trump has been subjected to many criticisms about conflicts of interest in connection with his holding Office as President of the United States of America. Additionally, issues have been raised whether certain moneys received by President Trump on account of these business holdings violate Article I, § 9, Clause 8, of the Constitution of the United States ("Foreign Emoluments Clause"), and also Article II, § 1, Clause 7, of the Constitution ("Domestic Emoluments Clause").

7.     In fact, an action was filed in this Court on January 23, 2017, describing in detail numerous conflict of interest concerns, and identifying a number of President Trump's business holdings alleged to be problematic under the Foreign Emoluments Clause. *See Citizens for Responsibility and Ethics in Washington v. Donald J. Trump, in his official capacity as President of the United States of America*, No. 17 Civ. 458 (RA) ("*CREW*"). Among other relief, *CREW*

seeks a declaration that the conduct involving President Trump described in its complaint "is violating or will violate the Foreign Emoluments Clause," and also seeks injunctive relief enjoining President Trump "from violating the Foreign Emoluments Clause, as construed by this Court."

8.      During a January 11, 2017 press conference held before President Trump was inaugurated as the 45th President of the United States on January 20, 2017, a plan intended to establish a structure for eliminating claimed conflicts of interest and potential violations of the Foreign Emoluments Clause was announced by counsel Sheri Dillon on behalf of then-President-elect Trump (the "Plan").[1]

9.      A "White Paper" entitled "Conflicts of Interest and the President" authored by Ms. Dillon and five other lawyers from the firm of Morgan, Lewis & Bockius LLP provided background for President-elect Trump's January 11, 2017 press conference, including a detailed presentation of the Plan and the actions President Trump had taken and would take to eliminate the claimed conflicts of interest and potential Foreign Emoluments Clause violations. A copy of the "White Paper" is Exhibit 1 to Plaintiff's Complaint.[2]

10.      To address possible ethics and conflict of interest issues, the Plan generally involves the transfer by President Trump, as Trustor, of all of his investments and business assets—commonly known as The Trump Organization—into the Trust, and President Trump is completely walled-off and precluded from any involvement in the management of The Trump Organization during the entirety of his term of Office. Instead, the Trustees, collectively and unanimously, will have the management authority and full decision-making authority over The

---

[1] Full transcript and video of January 11, 2017 conference available at:
https://www.nytimes.com/2017/01/11/us/politics/trump-press-conference-transcript.html?_r=0

[2] White Paper available at: https://assets.documentcloud.org/documents/3280261/MLB-White-Paper-1-10-Pm.pdf

Trump Organization for the duration of President Trump's Presidency. Further, the Plan and the Trust's Trust Agreement limit the ability of the businesses of The Trump Organization to engage in defined foreign and domestic transactions posing conflict of interest concerns. White Paper, at 2-3.

11.     To address both conflict of interest concerns and issues relating to potential violations of the Foreign Emoluments Clause and the Domestic Emolument Clause, the Trust Agreement also prohibits The Trump Organization "from entering into any new transaction or contract with a foreign country, agency, or instrumentality thereof, including a sovereign wealth fund, foreign government official, or member of a royal family, the United States government or any agency or instrumentality thereof, or any state or local government or any agency or instrumentality thereof, other than normal and customary arrangements already undertaken before [President Trump's] election." White Paper, at 3.

12.     Although the Foreign Emoluments Clause prohibits President Trump from accepting "any … Emolument … of any kind whatever, from any King, Prince or foreign State" "without the Consent of the Congress," neither the Foreign Emoluments Clause nor the Constitution provides a procedure for the disposal of prohibited Foreign Emoluments received by President Trump.

13.     To further eliminate issues relating to potential violations of the Foreign Emoluments Clause, President Trump has promised and agreed that he "will donate all profits from foreign governments' patronage of his hotels and similar businesses during his presidential term to the U.S. Treasury." White Paper, at 6. Until paid to the Treasury, all such profits of necessity are or will be held in the Trust managed and controlled by the Trustees, and the Trust Agreement either expressly or impliedly addresses these profits. However, the White Paper

includes no specifics regarding the procedures to be employed by the Trustees to account for these profits and pay them to the U.S. Treasury.

14.     The White Paper also generally discusses the Domestic Emoluments Clause, which prohibits President Trump from receiving during his term of Office "any other Emolument from the United States, or any of them" except his guaranteed Compensation. White Paper, at 4, 5.[3] The Domestic Emoluments Clause includes no provision for "the Consent of the Congress" to validate President Trump's retention of these prohibited Emoluments. Nor—as with the Foreign Emoluments Clause—does the Domestic Emoluments Clause or the Constitution provide a procedure for the disposal of prohibited Domestic Emoluments received by President Trump. In any event, the Plan as publicly described in the White Paper does not include a promise or agreement by President Trump to donate to the U.S. Treasury during his presidential term all profits from patronage by "the United States, or any of them," of his hotels and similar businesses.

15.     Because President Trump has promised and agreed to "donate all profits from foreign governments' patronage of his hotels and similar businesses during his presidential term to the U.S. Treasury," the issue of "the Consent of the Congress" or the need for any specific Congressional action under the Foreign Emoluments Clause regarding these profits has been obviated.

16.     Thus, the goal of Plaintiff's lawsuit is to provide a mechanism and appropriate procedures to ensure, on behalf of the People, that "all profits from foreign governments' patronage of [President Trump's] hotels and similar businesses during his presidential term" that

---

[3] Although at page 4 the White Paper cites to "Article II, § 7, Clause 7" of the Constitution for the Domestic Emoluments Clause, the correct citation is to Article II, § 1, Clause 7.

President Trump has promised and agreed will be paid to the U.S. Treasury are, in fact, paid to the U.S. Treasury.

17.     To achieve this goal, Plaintiff seeks an order and judgment by the Court (i) imposing an equitable constructive trust for the benefit of the People on "all profits from foreign governments' patronage of [President Trump's] hotels and similar businesses during his presidential term," (ii) directing an equitable accounting of these profits, and appointing a master under Federal Rule of Civil Procedure 53 with the necessary authority to perform the accounting of these profits for payment to the U.S. Treasury, and (iii) directing the payment by the Trustees of these properly accounted for profits to the U.S. Treasury. Plaintiff also seeks corresponding declaratory relief establishing the right to these equitable remedies.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) asserting claims on behalf of a class comprised of the People of the United States of America.

19.     Rule 23(a)(1) is satisfied because the People are numerous.

20.     Rule 23(a)(2) is satisfied because the entitlement of Plaintiff and the People to an equitable constructive trust on and equitable accounting for "all profits from foreign governments' patronage of [President Trump's] hotels and similar businesses during his presidential term" to ensure that the Trustees pay the proper amounts of profits to the U.S. Treasury, as well as the entitlement of Plaintiff and the People to corresponding declaratory relief establishing the right to these equitable remedies, are common questions of law and fact shared by all of the People.

21.     Rule 23(a)(3) is satisfied because Plaintiff's claims are typical of and identical to the claims of all of the People.

22.     Rule 23(a)(4) is satisfied because Plaintiff, a member of the class, is committed to the vigorous prosecution of the claims of the People, and has more than 25 years of experience in the prosecution of class actions, including complex business class actions and class actions involving constitutional issues, by which he can adequately represent their interests.

23.     Rule 23(b)(2) is satisfied because the same injunctive relief and declaratory judgment would provide relief to each and all of the People, and the Complaint seeks no individualized awards of damages.

## COUNT I
**Declaratory and Corresponding Affirmative Relief – Equitable Constructive Trust**

24.     Plaintiff realleges and incorporates each and every allegation set forth in this Complaint as if set forth verbatim herein.

25.     Plaintiff and the People are the intended third-party beneficiaries of President Trump's promise and agreement to "donate all profits from foreign governments' patronage of his hotels and similar businesses during his presidential term to the U.S. Treasury."

26.     These profits belong in good conscience to the People, and can clearly be traced to particular funds held in the Trust under the possession, custody and control of the Trustees.

27.     Plaintiff and the People are entitled, under 28 U.S.C. §§ 2201-2202, to (i) a declaratory judgment that these profits should be held in an equitable constructive trust for the benefit of the People, and (ii) the corresponding imposition by the Court of the constructive trust.

**COUNT II**
**Declaratory and Corresponding Affirmative Relief – Equitable Accounting**

28.     Plaintiff realleges and incorporates each and every allegation set forth in this Complaint as if set forth verbatim herein.

29.     The extraordinarily complex nature of the business holdings of The Trump Organization require the exercise of the equitable judicial Power of this Court to unravel the sources and amounts of "all profits from foreign governments' patronage of [President Trump's] hotels and similar businesses during his presidential term" that should be held in the constructive trust until paid to the U.S. Treasury.

30.     Plaintiff and the People are entitled, under 28 U.S.C. §§ 2201-2202, to (i) a declaratory judgment that these profits are subject to an equitable accounting continuing during President Trump's term of Office, and (ii) the corresponding direction by the Court to conduct such accounting to determine the amounts of profits that should be paid to the U.S. Treasury.

31.     Additionally, the Court should appoint a master under Fed. R. Civ. P. 53 with the necessary authority to perform the accounting, to be paid from the profits accounted for under the terms and procedures approved by the Court. Alternatively and preferably, the master, along with those whom the master chooses to assist in the performance of the master's duties, should be asked to perform the necessary accounting services pro bono and without compensation, in light of the complexity of this historic situation and its importance in protecting and preserving our Constitutional form of government.

**COUNT III**
**Declaratory and Corresponding Affirmative Relief – Payment of Profits**

32.     Plaintiff realleges and incorporates each and every allegation set forth in this Complaint as if set forth verbatim herein

33.     As the "profits [held in the Trust] from foreign governments' patronage of [President Trump's] hotels and similar businesses" are placed in the equitable constructive trust imposed by the Court and equitably accounted for by the master on a continuing basis during President Trump's term of Office, then, in accordance with President Trump's promise and agreement, these profits should be paid by the Trustees to the U.S. Treasury.

34.     Plaintiff and the People are entitled, under 28 U.S.C. §§ 2201-2202, to (i) a declaratory judgment that after the profits placed in the equitable constructive trust are equitably accounted for by the master and the accounting for these profits approved by the Court, the Trustees must pay these profits to the U.S. Treasury within a reasonable time prescribed by the Court, and (ii) the corresponding direction to the Trustees by the Court to make these payments.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the People of the United States of America, prays for relief, and judgment in his and their favor, as follows:

A.     Certifying this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(2), with Plaintiff certified as representative of the class comprised of the People;

B.     Under 28 U.S.C. §§ 2201-2202, (i) declaring that Plaintiff and the People are the intended third-party beneficiaries of President Trump's promise and agreement to "donate all profits from foreign governments' patronage of his hotels and similar businesses during his presidential term to the U.S. Treasury," (ii) declaring that these profits should be held in an equitable constructive trust for the benefit of the People, and (iii) imposing an equitable constructive trust on these profits;

C.     Under 28 U.S.C. §§ 2201-2202, (i) declaring that "all profits from foreign governments' patronage of [President Trump's] hotels and similar businesses" are subject to an

equitable accounting continuing during President Trump's term of Office, (ii) directing such accounting to determine the amounts of profits that should be paid to the U.S. Treasury, and (iii) appointing a master under Fed. R. Civ. P. 53 with the necessary authority to perform the accounting, to be paid from the profits accounted for under the terms and procedures approved by the Court. Alternatively and preferably, the master, along with those whom the master chooses to assist in the performance of the master's duties, should be asked to perform the necessary accounting services pro bono and without compensation, in light of the complexity of this historic situation and its importance in protecting and preserving our Constitutional form of government;

D.      Under 28 U.S.C. § 2201-2202, (i) declaring that after the profits placed in the equitable constructive trust are equitably accounted for by the master and the accounting for these profits approved by the Court, the Trustees must pay these profits to the U.S. Treasury within a reasonable time prescribed by the Court, and (ii) directing the Trustees to make these payments;

E.      Awarding the costs and disbursements incurred in connection with this action, including fees and expenses, under 28 U.S.C. § 2412 or as otherwise appropriate; and

F.      Granting such other and further relief as the Court deems just and proper.

Dated: February 10, 2017

/s/ William R. Weinstein
William R. Weinstein
LAW OFFICES OF WILLIAM R. WEINSTEIN
199 Main Street, 4th Floor
White Plains, New York 10601
(914) 997-2205
wrw@wweinsteinlaw.com

PLAINTIFF PRO SE AND ATTORNEY
FOR THE PEOPLE OF THE UNITED
STATES OF AMERICA

# EXHIBIT 1

# Morgan Lewis

## WHITE PAPER

### Conflicts of Interest and the President

Background for President-Elect Trump's January 11, 2017 Press Conference
Prepared by Morgan, Lewis & Bockius LLP[1]

## I. OVERVIEW

From President Washington to Vice President Rockefeller to President-Elect Trump, many of this Nation's leaders have been extraordinarily successful businessmen.  Neither the Constitution nor federal law prohibits the President or Vice President from owning or operating businesses independent of their official duties, as a careful textual and historical analysis shows.

Generally speaking, federal conflict-of-interest laws prohibit "officers" or "employees" of the United States from taking positions against the country's interests, maintaining outside employment, receiving an outside salary for official duties, or taking official acts that affect their personal financial interests.[2]

But these laws have historically not applied to the President or Vice President.  As then-Assistant Attorney General Antonin Scalia observed in an Office of Legal Counsel memorandum, the term "officer" typically includes neither the President nor Vice President.[3]  And since 1989, Congress has approved this tradition by expressly excluding the President and Vice President—along with Members of Congress and federal judges—from most conflict-of-interest laws.[4]  The Office of Government Ethics has recently re-affirmed that these conflict-of-interest laws do not apply to the President.[5]

Though Congress has long exempted the President and Vice President from federal conflict-of-interest laws, consistent with a tradition extending back to the Founding, many of these public servants have nevertheless sought to provide extra assurances that their undivided commitment is to the good of the country.  For example, Presidents Johnson and Carter voluntarily stepped away from their broadcasting stations and peanut farms.[6]

Today, President-Elect Trump wishes to announce his own plans to transfer management of his businesses and to voluntarily limit those businesses' ability to engage in transactions that could pose any conflict-of-interest concerns.

---

[1]   Authored by:  Sheri Dillon, Fred F. Fielding, Allyson N. Ho, Michael E. Kenneally, William F. Nelson, and Judd Stone.

[2]   *See generally* 18 U.S.C. §§ 203, 205, 207-09.

[3]   Memorandum from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, to Kenneth A. Lazarus, Associate Counsel to the President, *Applicability of 3 C.F.R. Part 100 to the President and Vice President* (Dec. 1974).

[4]   18 U.S.C. § 202(c) (stating that, unless otherwise provided, "officer" and "employee" do not include President or Vice President).

[5]   Letter from Walter M. Shaub, Jr., Director, Office of Government Ethics, to Senator Thomas R. Carper, at 2 (Dec. 12, 2016) ("[T]he primary criminal conflicts of interest statute, 18 U.S.C. § 208, is inapplicable to the President[.]").

[6]   *See* Megan J. Ballard, *The Shortsightedness of Blind Trusts*, 56 KAN. L. REV. 43, 54-56 (2007).

## II. THE PRESIDENT-ELECT'S PLAN

### Leadership and Management of The Trump Organization

President-Elect Trump will relinquish management of his investment and business assets for the duration of his Presidency.  To accomplish this, all of President-Elect Trump's investment and business assets, commonly known as The Trump Organization—comprised of hundreds of entities—have been or will be conveyed to a Trust, which will be managed for the duration of his Presidency by his sons, Don and Eric, and a Trump executive, Allen Weisselberg.  Collectively—and unanimously—Allen, Don, and Eric will have the authority to manage The Trump Organization and have full decision-making authority for the duration of the Presidency, without any involvement whatsoever by President-Elect Trump.  To implement this transfer, President-Elect Trump will resign from all official positions he holds with The Trump Organization entities.

Further, to ensure that The Trump Organization continues to operate in accordance with the highest ethical standards, President-Elect Trump is appointing an Ethics Advisor to the management team.  Under the terms of the Trust Agreement, written approval of the Ethics Advisor is required for all actions, deals, and transactions that could potentially raise ethics or conflict-of-interest concerns.  President-Elect Trump, as well as Don, Eric, and Allen are committed to ensuring that the activities of The Trump Organization are beyond reproach, and that the Organization avoids even the appearance of a conflict of interest, including through any advantage derived from the Office of the Presidency.

As part of her family's transition to Washington, D.C., President-Elect Trump's daughter, Ivanka Trump will resign from all of her positions in The Trump Organization and the Ivanka Trump brand/fashion business and will have no involvement with the management or operations of either organization.  As she and her husband Jared move their family to D.C. in the coming weeks, Ms. Trump will be focused on settling her children into their new home and schools.

### Status of President-Elect Trump's Investments

President-Elect Trump has already disposed of his investments in publicly traded or easily liquidated investments.  As a result, the Trust will hold only two kinds of assets:  liquid assets, such as cash, obligations of the United States government, and positions in a government-approved diversified portfolio, and the President-Elect's preexisting, illiquid, very valuable business assets.  These include Trump-owned, operated, and branded golf clubs, commercial rental property, resorts, hotels, and rights to royalties from preexisting licenses of Trump marks, productions, books, goods, and similar assets.  Examples of these assets include Trump Tower, Mar-a-Lago, Trump International Hotels, and Trump Vineyard Estates.

### Status of The Trump Organization's Deals and Rules for Entering into New Deals

The President-Elect also recognizes that his election was a significant event for the country—and one from which he should not benefit personally.  The President-Elect therefore directed The Trump Organization to terminate all pending deals—over 30 in number—which resulted in an immediate financial loss of millions of dollars, not just for President-Elect Trump but for Don, Ivanka, and Eric as well.

Since then, The Trump Organization has not sought or entered into any new deals.  It has in essence been functioning only as an asset management company, and will continue to do so until after the new management and ethics review structure, as set forth in the Trust Agreement, is in place.  Going forward, the Trust Agreement places severe restrictions on new deals to avoid any possible conflicts of interest or concerns that The Trump Organization is exploiting the Office of the Presidency.

First, the Trust Agreement prohibits—without exception—new foreign deals during the duration of President-Elect Trump's Presidency.  Specifically, the Trust and The Trump Organization will be prohibited at all times during the Presidency from engaging in any new deals with respect to the use of the "Trump" brand or any trademark, trade name, or marketing intangibles associated with The Trump Organization or Donald J. Trump in any foreign jurisdictions.

Second, new domestic deals will go through a rigorous vetting process.  At a minimum, new deals shall require:   (i) the unanimous vote of approval of the Trustees, and (ii) written confirmation from the Ethics Advisor that the proposed transaction is both substantively and procedurally an arm's-length transaction, that it involves an appropriate counterparty, and that it does not raise potential conflicts of interest or similar ethics issues.   President-Elect Trump will have no role in deciding whether The Trump Organization engages in any new deal, and he will be completely sequestered from any information regarding the Organization's decisions; in other words, he will learn about them only through the media, as the American People would.

Third, the Trust Agreement prohibits The Trump Organization from entering into any new transaction or contract with a foreign country, agency, or instrumentality thereof, including a sovereign wealth fund, foreign government official, or member of a royal family, the United States government or any agency or instrumentality thereof, or any state or local government or any agency or instrumentality thereof, other than normal and customary arrangements already undertaken before the President-Elect's election.

**Further Measures Taken to Isolate President-Elect Trump from The Trump Organization**

To further reinforce the President-Elect's separation from The Trump Organization, the Trust Agreement will sharply limit the information that the President-Elect receives regarding the Trust's assets.  Reports transmitted to the President-Elect will only reflect the profit or loss of the Company as a whole.  The reports will not include an accounting of the performance of each individual business within the Company.  Conversely, the President-Elect will not share nonpublic information with The Trump Organization or the Trust, and the Trust will not make use of any nonpublic information, from any governmental source, to engage in financial transactions on the Company's behalf.

To assist its employees in operating at the highest level of integrity and ethical standards, The Trump Organization has established the new position of Chief Compliance Officer.  The sole responsibility of the Chief Compliance Officer is to ensure that The Trump Organization businesses are operating at the highest levels of integrity and are not taking any actions that actually exploit, or even could be perceived as exploiting, the Office of the Presidency.  In addition, The Trump Organization has directed that no communications of the Organization, including social media accounts, will reference or otherwise be tied to President-Elect Trump's role as President of the United States or the Office of the Presidency.

In summary, President-Elect Trump is taking these extraordinary steps to ensure that the Office of the Presidency is isolated from The Trump Organization.  President-Elect Trump promised the American People that he would Make America Great Again:  he takes these steps to assure the American People that his sole focus is on that pledge—and that he intends only for the American People to benefit from his term as President.

**III.  THE FOREIGN EMOLUMENTS CLAUSE**

Some commentators have claimed that the Constitution prevents the President-Elect from owning interests in businesses that serve foreign customers.  In particular, they object to the Trump International Hotel in Washington, D.C.

On assuming office, the President-Elect will be bound by—and will scrupulously abide by—his obligations under the Constitution.  That includes the obligations created by the constitutional provision that these

commentators highlight, the Foreign Emoluments Clause.  That provision prohibits an individual holding an "Office of Profit or Trust" under the United States from "accept[ing]" a "present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" without congressional approval.[7]  But these commentators are wrong to suggest that business in the ordinary course at any of the Trump International Hotels, or at any of the President-Elect's businesses, risks violating this obligation.

The scope of any constitutional provision is determined by the original public meaning of the Constitution's text.[8]  Here that text, understood through historical evidence, establishes that foreign governments' business at a Trump International Hotel or similar enterprises is not a "present, Emolument, Office, or Title."  So long as foreign governments pay fair-market-value prices, their business is not a "present" because they are receiving fair value as a part of the exchange.[9]  It clearly is not an "Office"[10] or a "Title"[11] from that government.  These commentators therefore must rest their argument on the final category of prohibited benefit:  "Emolument."

As shown below, an emolument was widely understood at the framing of the Constitution to mean any compensation or privilege associated with an *office*—then, as today, an "emolument" in legal usage was a payment or other benefit received as a consequence of discharging the duties of an *office*.  Emoluments did not encompass all payments of any kind from any source, and would not have included revenues from providing standard hotel services to guests, as these services do not amount to the performance of an office, and therefore do not occur as a consequence of discharging the duties of an office.

The Constitution's text shows that the word had this more limited meaning.  Apart from the Foreign Emoluments Clause, the term emolument appears twice more in the Constitution, and both times refers to compensation associated with an office.  First, the Incompatibility Clause bars congressmen from assuming "any civil Office . . . the Emoluments whereof shall have been encreased during" the congressman's tenure.  U.S. CONST. art. I, § 6, cl. 2.  Second, the Compensation Clause, which guarantees the President's compensation during his term of office, prohibits him from "receiv[ing] within that Period any other Emolument from the United States, or any of them."  *Id.* art. II, § 1, cl. 7.

Although the Supreme Court has never interpreted the scope of the Foreign Emoluments Clause, it long ago understood "emolument" this way in another context.  The Court explained that "the term *emoluments* . . . embrac[es] every species of compensation or pecuniary profit derived from a discharge of the duties of [an] office."  *Hoyt v. United States*, 51 U.S. 109, 135 (1850).  Other legal experts early in the Nation's history used the word the same way, including Alexander Hamilton and James Madison in *The Federalist Papers*[12] and Attorneys General in numerous formal opinions.[13]

Supporting this understanding is parallel language in the nearly adopted Titles of Nobility Amendment to the Constitution.  In 1810, Congress voted by overwhelming margins to extend the Foreign Emoluments Clause to all citizens, not just federal officials.[14]  The proposed amendment would have prohibited private citizens' acceptance of "any present, pension, office, or emolument, of any kind whatever, from any

---

[7]   U.S. CONST. art. I, § 9, cl. 8.

[8]   *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 78-92 (2012); Antonin Scalia, *Originalism:  The Lesser Evil*, 57 U. CIN. L. REV. 849, 862-64 (1989).

[9]   *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "gift" as "[t]he voluntary transfer of property to another without compensation").

[10]   *See id.* (defining "office" as "[a] position of duty, trust, or authority, esp. one conferred by a governmental authority for a public purpose").

[11]   As suggested by the immediately preceding prohibition on the granting of titles of nobility, U.S. CONST. art. I, § 9, cl. 8, "Title" refers to official titles of honor or distinction.

[12]   *See, e.g.*, THE FEDERALIST 2, 177, 243, 268, 340, 379-80 (G. Carey & J. McClellan eds., 2001).

[13]   *E.g.*, *Salaries of Officers of Arkansas Territory*, 1 Op. Att'y Gen. 310, 310 (1819); *Salaries to Ministers and Consuls*, 2 Op. Att'y Gen. 470, 471 (1831); *Marshal of Florida*, 6 Op. Att'y Gen. 409, 410 (1854).

[14]   20 ANNALS OF CONGRESS 671, 2050-51 (1853).

Emperor, King, Prince, or foreign Power," stripping violators of their citizenship and barring them from state or federal office.[15]   The amendment came within two states of ratification—indeed, because of a publishing mistake, several generations believed it *was* part of the Constitution.[16]

Yet there is no evidence anyone at the time thought the proposed amendment restricted citizens' ability to engage in commerce with foreign nations, their governments, their representatives, or their instrumentalities.  That suggests that the public did not understand the prohibition on accepting foreign emoluments to prohibit commerce with foreign states or their representatives through fair-market-value exchanges—and, by implication, that the Foreign Emoluments Clause does not reach these transactions.  Given the importance of foreign trade in the Nation's early decades, the absence of any indication that the proposed amendment would have had this effect further supports understanding "emolument" not to encompass fair-market-value transactions—consistent with the term's other uses in the Constitution, its common legal use at the Founding, and the Supreme Court's explanation of the term.

There are further problems with understanding "emoluments" to include any kind of benefit an individual might receive.  For one thing, it would have been redundant to list "present" and "Emolument" in the Clause separately, because any present would already qualify as a benefit.  For another thing, it would lead to absurd results.  For example, if the Constitution's Article II prohibition on the President receiving "any other Emolument from the United States, or any of them" refers to *any* benefit, including fair-market-value transactions, then the President violates the Constitution by purchasing Treasury bonds or receiving interest on a retirement account from federal or State bonds.[17]  That cannot be correct.

Commentators who argue for a more expansive understanding of the Clause tend to focus not on the Constitution's original public meaning, but on more subjective conceptions of the policies behind the Clause.  Moreover, while non-judicial opinions provided to guide members of the Executive Branch have suggested that the Clause has a broad scope, none of the published opinions has gone so far as to classify fair-market-value transactions as emoluments.  And the factual circumstances giving rise to opinions finding Foreign Emoluments Clause violations are different from those here.[18]

Other opinions fully accord with the Constitution's original public meaning and are incompatible with the notion that the Constitution prohibits the President-Elect's businesses from renting hotel rooms to foreign governments at fair-value rates.  One opinion, for example, declined to view a pension as an emolument because it was neither a gift nor a salary.[19]  Another reached a similar conclusion about civil damages paid to a victim of Nazi persecution because they were "not paid as profit, gain, compensation, perquisite, or advantage flowing to him as an incident to possession of an office or as compensation for services rendered."[20]  Still another acknowledged that emoluments were "profit[s] arising from office or

---

[15]   *Id.* at 671.

[16]   *See* Gideon M. Hart, *The "Original" Thirteenth Amendment:  The Misunderstood Titles of Nobility Amendment*, 94 MARQ. L. REV. 311, 313-15 (2010); Curt E. Conklin, *The Case of the Phantom Thirteenth Amendment:  A Historical and Bibliographic Nightmare*, 88 LAW LIBR. J. 121, 126 (1996) ("[T]hree or more generations of Americans grew up assuming that the amendment was law.").

[17]   *See* Andy Grewal, *Should Congress Impeach Obama for His Emoluments Clause Violations?*, YALE J. ON REG.: NOTICE & COMMENT (Dec. 13, 2016), http://yalejreg.com/nc/should-congress-impeach-obama-for-his-emoluments-clause-violations/.

[18]   *See, e.g.*, *To the Secretary of the Air Force*, 49 Comp. Gen. 819, 820–21 (1970) (informant for Columbian government); *In re: Major Stephen M. Hartnett, USMC, Retired*, 65 Comp. Gen. 382, 383 (1986) (employment by Royal Saudi Navy); *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 96 (1986) (work on contract with Taiwanese government); *Authority of Foreign Law Enforcement Agents to Carry Weapons in the United States*, 12 Op. O.L.C. 67, 69 (1988) (foreign law-enforcement agents); *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993) (partnership in law firm that represented foreign government); *Emoluments Clause and World Bank*, 25 Op. O.L.C. 113, 114 (2001) (contractual employment relationship).

[19]   *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 191 (1981).

[20]   *Assistant Comptroller General Weitzel to the Attorney General*, 34 Comp. Gen. 331, 334 (1955).

employment" and generally required services for a foreign government amounting to accepting an office from a foreign state.[21]

In short, the Constitution does not forbid fair-market-value transactions with foreign officials.  To put to rest any concerns, however, the President-Elect is announcing he will donate all profits from foreign governments' patronage of his hotels and similar businesses during his presidential term to the U.S. Treasury.  Historically, when federal officers received a gift or emolument from a foreign state, they surrendered possession of it to the federal government,[22] though they were permitted to retain amounts necessary to offset their business expenses.[23]  Although the Constitution does not require the President-Elect to do the same for profits from his businesses' fair-market-value transactions, he wants to eliminate any distractions by going beyond what the Constitution requires.

---

[21]  *To C.C. Gordon, U.S. Coast Guard,* 44 Comp. Gen. 130, 130-31 (1964); *see also Foreign Diplomatic Commission,* 13 Op. Att'y Gen. 537, 538 (1871) ("[A] minister of the United States abroad is not prohibited by the Constitution from rendering a friendly service to a foreign power, even that of negotiating a treaty for it, provided he does not become an officer of that power.").

[22]  *E.g.,* 12 ANNALS OF CONGRESS 443 (1851).

[23]  REMINISCENCES OF JAMES A. HAMILTON 210 (1869) (officer who received horses as gift from foreign state was entitled to be paid for "expenses incident to their transportation and keeping"); *cf. Applicability of the Emoluments Clause to Non-Government Members of ACUS,* 17 Op. O.L.C. 114, 119 (1993) (objecting to retention of law firm profits, not pre-expense revenues).

Morgan, Lewis & Bockius LLP